2013-1356

---

# United States Court of Appeals for the Federal Circuit

---

### DECKERS CORPORATION,

*Plaintiff-Appellant,*

v.

### UNITED STATES,

*Defendant-Appellee.*

---

**Appeal from the United States Court of International Trade in
Case No. 1:02-CV-0732,
Honorable Thomas J. Aquilino, Jr., Senior Judge**

---

**PETITION OF APPELLANT, DECKERS CORPORATION,
FOR REHEARING EN BANC**

---

**RODE & QUALEY**
*Attorneys for Plaintiff-Appellant*
**55 West 39th Street
New York, New York 10018
(212) 944-7333**

**Patrick D. Gill**
*Attorney of Record*
**William J. Maloney
R. Brian Burke**
*Of Counsel*

**Dated: June 5, 2014**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Deckers Corporation v. United States
No. 2013-1356

## CERTIFICATE OF INTEREST

Counsel for the appellant Deckers Corporation certifies the following (use "None" if applicable, use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

   **DECKERS CORPORATION, legally known as
   DECKERS OUTDOOR CORPORATION**

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   **None**

3. All parent corporations and any publically held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   **None**

4.X There is no such corporation as listed in paragraph 3.

5. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

   **Patrick D. Gill, Of Counsel, Rode & Qualey
   William J. Maloney, Partner, Rode & Qualey
   Eleanore Kelly-Kobayashi, Of Counsel, Rode & Qualey**

_____          _____
Date            6/5/14                          Signature of counsel
                                                PATRICK D. GILL

# **TABLE OF CONTENTS**

STATEMENT OF COUNSEL……………………………………………….….1

POINTS OF LAW CITED BY THE PANEL WHICH JUSTIFY REHEARING EN BANC…………………………………………………………………………..2

ARGUMENT …………………………………………………….…………...5

ADDENDUM

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Chapparral Steel Co. v. United States*,
 901 F.2d 1097 (Fed. Cir. 1990) ..............................................................11

*Deckers Corp. v. United States*,
 532 F.3d 1312 (Fed. Cir. 2008) .............................................. 2, 5, 6, 7, 8, 9, 10, 11

*Deckers Corp. v. United States*, No. 02-00732,
 2013 LW 1924357 at \*4 (Ct. Int'l Trade Apr. 12, 2013) ...................... 2, 6, 7, 8, 9

*H.W. Robinson Air Freight Corp. v. United States*,
 48 C.C.P.A. 148 (1961) ............................................................................3

*Lewis, Trustee v. United States*,
 92 U.S. 618 (1876) ...................................................................................11

*Raphael v. United States*,
 23 C.C.P.A. 253 (1936) ............................................................................3

*Sandoz Chem Works, Inc. v. United States*,
 50 C.P.P.A. 31 (1963) ..............................................................................11

*Schott Optical Glass, Inc. v. United States*,
 750 F.2d 62 (Fed. Cir. 1984) ...................................................................3

*Shell E. Petroleum Products v. United States*,
 28 C.C.P.A. 155 (1940)...............................................................................3, 6

*United States v. Mercantil Distribuidora*,
 *S.A.*, 45 C.C.P.A. 20 (1957)....................................................................9

*United States. v. Stone & Downer Co.*,
 274 U.S. 225 (1927) ................................................................... 3, 5, 8, 9

## <u>RULES OF THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT</u>

Rule 35(b)(2)…………………………………………………………………….…1

## <u>STATUTORY PROVISIONS</u>

**Harmonized Tariff Schedule of the United States**

Subheading 6404.11 .................................................................... 2, 5, 6, 7, 8

## <u>TREASURY DECISIONS</u>

T.D. 93-88, 27 Cust. Bull. 312 (1993). ......................................................6

## STATEMENT OF COUNSEL

Pursuant to Rule 35(b)(2), based on my professional judgment, I believe this appeal requires an answer to one or more precedent-setting questions of exceptional importance as set forth in the points of law that follow below and which were cited by the Court Panel as justification for rehearing en banc.

PATRICK D. GILL
Attorney of Record for Deckers Corporation

## POINTS OF LAW CITED BY THE PANELWHICH JUSTIFY REHEARING EN BANC

The substantive issue in this appeal is whether the Teva® Sports Sandals in issue are properly classifiable under subheading 6404.11, HTSUS, as training shoes. The Teva® Sports Sandals were the subject of earlier litigation in *Deckers Corp. v. United States*, 532 F.3d 1312 (Fed. Cir. 2008), hereinafter referred to as "*Deckers I*." The instant appeal is from the decision of the United States Court of International Trade in *Deckers Corp. v. United States*, No. 02-00732, 2013 LW 1924357 at *4 (Ct. Int'l Trade Apr. 12, 2013), which is hereinafter collectively referred to as "*Deckers II*." The history of the case is contained in the Court's opinion, Slip Op. 2-8, and will not be repeated here. As a result of this Court's painstakingly thorough and well-reasoned analysis of the issues in the case, we respectfully submit that this petition for rehearing, invited by the decision itself, establishes compelling reasons why the petition should be granted.

The points of law cited by the Panel which justify rehearing en banc are as follows.

1. *Deckers I* is *stare decisis* of *Deckers II*. Slip Op. 31-32.

2. An exception to the rule of *stare decisis* is that a prior decision of the Court may be overturned if it is established that there was clear error in the prior

decision.  Slip Op. 23, citing *Raphael v. United States*, 23 C.C.P.A. 253, 258 (1936).

3.    Under the long-standing rule, first set forth by the Supreme Court in *United States. v. Stone & Downer Co*., 274 U.S. 225 (1927), the doctrine of *res judicata* does not apply in Customs classification cases and an importer in a classification case can present new evidence and relitigate both legal and factual issues in the case involving subsequent importations of the same type of merchandise.  Slip Op. 28, *Schott Optical Glass*, *Inc*. *v. United States*, 750 F.2d 62, 64 (Fed. Cir. 1984).

4.    Prior to the establishment of this Court, its predecessor, the Court of Customs and Patent Appeals (CCPA), on several occasions refused to apply the doctrine of *stare decisis* when clear error in a prior decision of that court was established in which case the prior decision was overturned.  Slip Op. 3 citing *Raphael v. United States,* 23 C.C.P.A. 253, 258 (1936), See also, *H.W. Robinson Air Freight Corp*. *v. United States*, 48 C.C.P.A. 148 (1961).  The Panel also noted that "the CCPA found that *stare decisis* did not prohibit reconsideration of legal issues where that issue was not fully presented in a prior case and is controlling." Slip Op. 23, fn.9, citing *Shell E. Petroleum Products v. United States,* 28 C.C.P.A. 155, 157 (1940), "(finding that *stare decisis* did not apply because the record in the second appeal presented new

evidence such that the issues were 'explained with a clarity that presents an entirely different view of the issue')."

5.      The CCPA <u>always</u> sat en banc in Customs classification cases, and as a result could set aside a prior decision under the clear error exception to *stare decisis* when appropriate. Slip Op. 27.

6.      Unlike the CCPA, this Court does not ordinarily sit en banc and a subsequent panel is bound by a panel decision in a prior case. Slip Op. 30-31.

7.      A prior panel decision can only be set aside by this Court under the clear error exception to *stare decisis* when it is sitting en banc. *Id.*

8.      In this case, the Court held "that while a party may challenge a prior construction of a tariff provision by a panel of this court in a classification case and may seek to introduce evidence of purported clear error in the prior classification to preserve the issue for potential en banc review, both the Court of International Trade and any subsequent panel of this court are bound by the earlier panel's classification construction." *Id.*

9.      "It is only as an en banc court that [this court] can review and alter a tariff classification construction by a prior panel." *Id.*

10. As a result of the foregoing holding, the Court in this case was bound by the *Deckers I* panel interpretation that any footwear described in subheading 6404.11 must always have enclosed uppers. Slip Op. 32.

11. In order to seek to overturn the Court's construction of the scope of subheading 6404.11 in *Deckers I*, Deckers must seek review en banc. Slip Op. 32.

12. Because under *Stone & Downer* Deckers has the right to present evidence of clear error and to have that evidence considered, and because under the rule of *stare decisis* and the rules of this Court such evidence may not be considered by a trial court or a Panel of this Court, the Court must review the decision in *Deckers I* en banc. Slip Op. 30-31.

13. Accordingly, Deckers is now following the Panel's advice to seek review en banc and we respectfully submit that the petition should be granted.

## ARGUMENT

In accordance with the decision of the Court in this appeal, Deckers has filed this petition for rehearing en banc. We respectfully submit that the following are compelling reasons why the petition for rehearing should be granted.

1. Deckers claims that the Teva® Sports Sandals are training shoes and that they are *eo nomine* provided for as such in subheading 6404.11.

2.   There are approximately 400 pages of deposition testimony that the Teva®
     Sports Sandals are "training shoes" that are designed, marketed, sold and
     used for jogging, running and training.  A. 36, 50, 56-59, 61-63, 65-69, 73-
     84, 101-102, 146, 159-199, 203-209, 216-219, 228, 239-306, 311, 317-399,
     341-348.[1]

3.   In footwear definitions published by Customs, training shoes are equated
     with joggers.  T.D. 93-88, 27 Cust. Bull. 312, 313 (1993). A. 101.

4.   The Panel in *Deckers II* found that the Teva® Sports Sandals "are shoes
     intended to be used for athletic pursuits, such as running, jogging, hiking,
     canyoneering, and a variety of water-based activities. Slip Op. 3.

5.   There is now a full record on the issue of the common and commercial
     meaning of "training shoe" that exposes the factual error which led to the
     clearly erroneous legal conclusion in issue.

6.   The evidence of record and the factual findings concerning the use of the
     subject footwear in this case explain the issues with a clarity that establishes
     that the subject footwear falls within the common and commercial meaning
     of "training shoes" leading inevitably to the logical conclusion that the
     holding in Deckers I as to the scope of 6404.11 is clearly erroneous.  See
     Slip Op. 23, fn.9 citing *Shell E. Petroleum Products v. United States, supra*.

---

[1] The citations to the appendix are to the appendix in this appeal.

We submit that in light of paragraphs 2, 3, 4 and 5 above, the evidence of record is sufficient to establish that the subject footwear are training shoes and that the holding in *Deckers I* that such footwear must have fully closed uppers is clearly erroneous. However, the Court may opt to remand the case to the trial court to review this evidence and any additional evidence on the issue.

7. Deckers should not be denied the opportunity to present its evidence to establish that if, as the Panel in this case has ruled, the holding in *Deckers I* was that no footwear can be classified in tariff subheading 6404.11 unless that footwear has a fully enclosed upper, then that holding was clear error.

8. There was a <u>factual</u> finding by the trial court in *Deckers I* that the footwear in subheading 6404.11 must have enclosed uppers, to wit: as reiterated by this Court in *Deckers II* - - "The evidence adduced at trial established that the *fundamental features that the exemplars share is the design, specifically the enclosed upper . . . .*" [Emphasis in original] Slip Op. 7.

9. Deckers seeks in *Deckers II* to have the Court consider evidence that this factual finding was incorrect and that the legal conclusion flowing therefrom was clear error as applied to the tariff term, "training shoes."

10. Indeed, the Government's own purported expert witness in *Deckers II* in a declaration under penalty of perjury stated that "some training shoes have openings in the uppers and are used as training shoes . . . ." A. 511.

11. The faulty, factual premise that all of the named exemplars must have enclosed uppers is the underpinning of the holdings of the trial court and this Court in *Deckers I*.

12. As noted by this Court in *Deckers II*, the "Court of International Trade found that the holding in *Deckers I* precluded it from classifying the Sports Sandals under subheading 6404.11 because the Sports Sandals did not have enclosed uppers." Slip Op. 7.

13. As a result, the Court of International Trade did not consider the overwhelming factual evidence that there is no such requirement for training shoes.

14. Under *Stone & Downer,* Deckers is clearly entitled to present evidence to contradict the erroneous factual finding by the Court of International Trade that subheading 6404.11 requires enclosed uppers for classification thereunder. Slip Op. 30-31.

15. Since the Panel in *Deckers II* is precluded by rules of the Court from overturning the holding in *Deckers I*, the Court must grant this petition for en banc review if Deckers is to have any opportunity for consideration of the

evidence that brings clarity to the issue that was not adequately presented in *Deckers I* and which Deckers submits establishes clear error in *Deckers I.*

16.    If en banc review is not granted, the result would be to effectively nullify the Supreme Court's holding in *Stone & Downer*, since it would be pointless to allow a party to relitigate factual and legal issues in a tariff classification case and to present evidence of error in a prior panel decision, when that second panel is powerless to reverse the prior determination.

17.    In the absence of en banc review, this judicial conundrum would guarantee the perpetuation of error no matter how clear that error might be.[2] *Stare decisis* is subject "to the qualification that *clear* error should not be perpetuated. *United States v. Mercantil Distribuidora, S.A.*, 45 C.C.P.A. 20, 24 (1957).

18.    En banc review is further warranted because the holding in *Deckers II* has yielded what on its face is an extremely anomalous result, namely, that an

---

[2]  Indeed, in the Information Sheet furnished by the Court with the decision in this case, it is precisely these circumstances which are cited as one of the examples which would justify the granting of a petition for rehearing en banc - - "the merits panel has followed circuit precedent, which the party seeks to have overruled by the court en banc."  A copy of the Information Sheet is included with the decision of the panel in the Addendum to this petition.

article which is designed, marketed, sold and used as a training shoe[3] cannot be classified in the *eo nomine* provision which specifically describes it.

19. The result is certainly at odds with the time honored principles recognized on page 14 of the Slip Opinion that

> [*e*]*o nomine* designation include all forms of an article, including future improvements to that article. *Nootka Packing Co. v. United States*, 22 C.C.P.A. 464, 470 (1935). *Eo nomine* terms are thus forward looking such that they include technological advancements, as long as the improved article performs the same essential function as the named exemplar.

It is the faulty and clearly erroneous factual premise in *Deckers I* that led to a legal interpretation that is uniquely at odds with these most basic principles of Customs law.

20. A departure from these black letter principles of Customs law would have important policy as well as legal implications and involves a question of exceptional importance.

21. It is also a basic principle of statutory interpretation to look at the statute itself to determine its plain meaning. We respectfully submit that nothing could be plainer than the term "training shoe," a shoe designed and used for

---

[3] There is overwhelming, unequivocal, uncontradicted evidence of this fact which was elicited by the Government in the depositions of Deckers' four potential witnesses. A. 36, 50, 56-59, 61-63, 65-69, 73-84, 101-102, 146, 159-199, 203-209, 216-219, 228, 239-306, 311, 317-339, 341-348.

training. When language is clear on its face, the Court need look no further to determine Congressional intent. *Chapparral Steel Co v. United States*, 901 F.2d 1097 (Fed. Cir. 1990); *Sandoz Chem Works, Inc. v. United States*, 50 C.P.P.A. 31 (1963). When the language of a statute is transparent and its meaning clear, there is no need for further statutory construction as was done in *Deckers I. Lewis*, *Trustee v. United States*, 92 U.S. 618 (1876).

22. Since Deckers is entitled to present evidence to establish clear error in the decision in *Deckers I*, the petition for en banc review should be granted so that the Court, sitting en banc, can consider whether the decision in *Deckers I* should be overturned reversing the decision below or whether the case should be remanded to the Court of International Trade to further develop the record for en banc review including factual findings.

For all of the foregoing reasons, Deckers respectfully submits that its

petition for rehearing en banc should be granted.

Respectfully submitted,

By: RODE & QUALEY
Attorneys for Plaintiff-Appellant
55 West 39th Street
New York, New York 10018
(212) 944-7333

Patrick D. Gill

*Of Counsel*
William J. Maloney
R. Brian Burke

12

# ADDENDUM

# United States Court of Appeals for the Federal Circuit

---

**DECKERS CORPORATION,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-1356

---

Appeal from the United States Court of International Trade in No. 02-CV-0732, Senior Judge Thomas J. Aquilino, Jr.

---

Decided: May 13, 2014

---

PATRICK D. GILL, Rode & Qualey, of New York, New York, argued for plaintiff-appellant. With him on the brief was WILLIAM J. MALONEY. Of counsel was RICHARD BRIAN BURKE.

MARCELLA POWELL, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were AMY M. RUBIN, Acting Assistant Director, International Trade Field Office; STUART F. DELERY, Assistant Attorney General, and JEANNE E. DAVIDSON, Director, of Washington, DC,

and MICHAEL W. HEYDRICH, Trial Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

---

Before PROST, SCHALL, and O'MALLEY, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

This appeal is about the proper tariff classification categories of Teva® Sandals imported by Deckers Corporation ("Deckers"). Deckers appeals the final judgment and decision of the United States Court of International Trade, which determined that the Teva® Sports Sandals at issue are properly classified under subheading 6404.19.35 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Because both the Court of International Trade and this panel are bound by the holding of the panel in *Deckers Corp. v. United States*, 532 F.3d 1312 (Fed. Cir. 2008) ("*Deckers I*"), and that holding is conclusive of the question before us, we *affirm.*

## BACKGROUND

Deckers imports a variety of Teva® Sports Sandals from Hong Kong for sale throughout the United States.[1] *Deckers Corp. v. United States*, 414 F. Supp. 2d 1252, 1252 (Ct. Int'l Trade 2005). The Sports Sandals all have

---

[1]  The Sports Sandals at issue in the *Deckers I* appeal included only the Pretty Rugged, Terradactyl, and Aquadactyl lines. *Deckers Corp.*, 414 F. Supp. 2d at 1252. The merchandise at issue in this appeal are the Pretty Rugged, Terradactyl, and Aquadactyl lines, as well as the Alp Pro, Vector, Terra Fi, Pretty Rugged Nylon, Circuit Nylon Women's, Way Point Terra Fi, Terra Fi Buckle, Road Wraptor, Trail Wraptor and Ultimate Thong Guide lines. None have fully enclosed uppers.

rubber or plastic soles and cloth or textile straps in the upper portion of the shoe. *Deckers I*, 532 F.3d at 1313. Importantly, the toe and heel sections of all of the Sports Sandals at issue are open, and the upper section of the Sport Sandals do not fully enclose the foot. *Id.* The Sports Sandals are shoes intended to be used for athletic pursuits, such as running, jogging, hiking, canyoneering, and a variety of water-based activities.

The United States Customs and Border Protection Service ("Customs") liquidated the sandals under subheading 6404.19.35, HTSUS ("subheading 6404.19.35"). *Deckers*, 414 F. Supp. 2d at 1252. Subheading 6404.19.35 includes:

6404    Footwear with outer soles of rubber, plastics, leather or composition leather and uppers of textile material:

　　　　Footwear with outer soles of rubber or plastics:

6404.19    Other: Footwear with open toes or open heels; footwear of the slip-on type, that is held to the foot without the use of laces or buckles or other fasteners:

6404.19.35    Other.

Products classified under subheading 6404.19.35 are subject to a duty of 37.5% *ad valorem*. Subheading 6404.19.35 is known as a "basket" provision that only becomes an appropriate subheading for classification if merchandise cannot be classified under a more specific subheading in heading 6404. *E.M. Chems. v. United States*, 923 F. Supp. 202, 206 (Ct. Int'l Trade 1996).

Deckers filed a protest against the subheading 6404.19.35 classification, requesting that the Sport Sandals be classified as either 6404.11.80, HTSUS, or 6404.11.90, HTSUS ("subheading 6404.11"). *Deckers*, 414

F. Supp. 2d at 1252. Both subheadings 6404.11.80 and
6404.11.90 include:

6404    Footwear with outer soles of rubber, plastics,
        leather or composition leather and uppers of tex-
        tile material:

            Footwear with outer soles of rubber or plas-
            tics:

6404.11     Sports footwear; tennis shoes, basketball
            shoes, gym shoes, training shoes and the
            like;

6404.11.80      Valued over $6.50 but not over $12 per
                pair

6404.11.90      Valued over $12 per pair

Products classified under subheading 6404.11.80 are
subject to a duty of $0.90 per pair plus 20% *ad valorem*.
Products classified under subheading 6404.11.90 are
subject to a duty of 20% *ad valorem*.  To be classified
under subheadings 6404.11.80 or 6404.11.90, the mer-
chandise must fit the description in subheading
6404.11□ they must be "sports footwear; tennis shoes,
basketball shoes, gym shoes, training shoes and the like."

In 2001, Deckers brought a test case before the Court
of International Trade regarding the classification dispute
over the Sport Sandals. *Deckers Corp. v. United States*,
Court No. 02-00674. On November 14, 2002, Deckers also
filed a summons with the Court of International Trade
that would eventually mature into the pending appeal.
Deckers then requested that the summons be suspended
during the pendency of the test case, and the Court of
International Trade granted Deckers's motion to suspend.

On a motion for summary judgment in the test case,
Deckers argued that Additional Note 2 to HTSUS Chap-
ter 64 defined the phrase "tennis shoes, basketball shoes,
gym shoes, training shoes and the like" of subheading

6404.11.[2] *Deckers*, 414 F. Supp. 2d at 1257-58. Specifically, Deckers claimed that Additional Note 2 makes clear that the named exemplars of subheading 6404.11 are interchangeable with the phrase "athletic footwear." *Id.* The Court of International Trade rejected this interpretation as "tenuous." *Id.* at 1258. To clarify the scope of subheading 6404.11, the Court of International Trade attempted to construe the "and the like" language of subheading 6404.11 through an *ejusdem generis* analysis,[3] but determined that there were outstanding factual issues to which Deckers should be entitled to respond at trial. *Id.* at 1258-61.

After trial, the Court of International Trade held that the Sports Sandals should be classified under subheading

---

[2]  Additional Note 2 to Chapter 64 HTSUS states: "For the purposes of this chapter, the term 'tennis shoes, basketball shoes, gym shoes, training shoes and the like' covers athletic footwear other than sports footwear (as defined in note 1 above), whether or not principally used for such athletic games or purposes." "Sports footwear," as defined in Subheading Note 1 to Chapter 64 HTSUS, only applies to: "(a) [f]ootwear which is designed for a sporting activity and has, or has provision for the attachment of spikes, sprigs, cleats, stops, clips, bars or the like; (b) [s]kating boots, ski-boots and cross-country ski footwear, snowboard boots, wrestling boots, boxing boots and cycling shoes." The "sports footwear" language of subheading 6404.11 and Subheading Note 1 is not relevant to the present appeal.

[3]  In an *ejusdem generis* analysis, "where an enumeration of specific things is followed by a general word or phrase, the general word or phrase is held to refer to things of the same kind as those specified." *Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1392 (Fed. Cir. 1994).

6404.19.35. *Deckers Corp. v. United States*, 31 Ct. Int'l
Trade 1367, 1372 (2007). Evidence at trial suggested that
the Sport Sandals could be used as athletic footwear for
some sports, but the Court of International Trade con-
cluded that the Sport Sandals could not be classified
under subheading 6404.11 because they were "sandals,"
and not "shoes" as required by that subheading. *Id.* at
1373 ("Again, there is and can be little doubt that that
term [shoe] does not cover the Teva®s at issue."). The
Court of International Trade noted that, while it is possi-
ble that certain forms of "human athletic activity have
engendered more-propitious types of footwear," the sub-
headings at issue are not written to cover the Sports
Sandals and it is for Congress, not the courts, to alter the
HTSUS provisions to cover such footwear. *Id.*

This court affirmed the Court of International Trade's
classification in *Deckers I*. The *Deckers I* panel first held
that Additional Note 2 to HTSUS Heading 6404 does not
subsume the listed exemplars in subheading 6404.11;
Note 2 merely explains that use alone does not establish
proper classification in that subheading. 532 F.3d at
1315.[4] We also clarified the Court of International
Trade's interpretation of the term "shoes." We found that
"there can be no doubt that sandals are 'shoes,'" but that
the Court of International Trade only noted that the Sport
Sandals were not shoes *as that term was intended* in
subheading 6404.11. *Id.* at 1317.

We then performed an *ejusdem generis* analysis to de-
termine the scope of the "and the like" term in subheading
6404.11. *Id.* at 1316-17. Deckers claimed that the essen-
tial characteristic of the listed exemplars was that they
were all athletic footwear, in essence repackaging its

---

4    Deckers does not contest this interpretation in the
present appeal.

Additional Note 2 argument. The court rejected this interpretation, holding that:

> The evidence adduced at trial established that the *fundamental feature that the exemplars share is the design, specifically the enclosed upper,* which contains features that stabilize the foot, and protect against abrasion and impact. Because the sandals at issue have open toes and open heels, and lack the features of the named exemplars of 6404.11.80, HTSUS, the imported goods are not classifiable under that subheading, *notwithstanding their claimed status as athletic footwear.*

*Id.* at 1317 (emphases added).

Deckers filed a complaint on March 22, 2010, seeking to reopen the summons that was suspended pending resolution of *Deckers I.* There, Deckers argued that the Sport Sandals fit within the *eo nomine* category of "training shoes" in subheading 6404.11.[5] Deckers submitted new evidence purportedly demonstrating undisputed facts that establish that the Sports Sandals are "training shoes." The Court of International Trade found that the holding in *Deckers I* precluded it from classifying the Sports Sandals under subheading 6404.11 because the Sports Sandals did not have enclosed uppers. *Deckers Corp. v. United States*, No. 02-00732, 2013 WL 1924357, at *4 (Ct. Int'l Trade Apr. 12, 2013) ("[T]he court cannot read the cited decision of the Court of Appeals for the Federal Circuit . . . as providing a basis for relief for

---

[5] An *eo nomine* classification is one that "describes a commodity by a specific name, usually one common in commerce," *Nidec Corp. v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995), and "describes an article by a specific name, not by use," *Aromont U.S.A., Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012).

which the plaintiff so skillfully prays herein."). The Court
of International Trade also stated that, in the original
motion to suspend in light of the earlier test case, Deckers
argued that suspension of the pending appeal would be
appropriate because "[that] test case involves the same
plaintiff, the same defendant, the same class or kind of
merchandise, i.e., sports sandals, and the same claims."
*Id.* Because the merchandise at issue was admittedly of
the same character as in the test case, the Court of Inter-
national Trade held that it was bound by the holding of
*Deckers I* under principles of *stare decisis. Id.* at *4-5.

Deckers timely appealed the determination of the
Court of International Trade, and we have jurisdiction
pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I

We review the Court of International Trade's grant of
summary judgment regarding a tariff classification with-
out deference. *CamelBak Prods., LLC v. United States,*
649 F.3d 1361, 1364 (Fed. Cir. 2011). We do accord some
deference to a Customs classification determination
pursuant to *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944),
and *United States v. Mead Corp.,* 533 U.S. 218, 235
(2001), but only to the extent of Customs' persuasive
power. *Warner-Lambert Co. v. United States,* 407 F.3d
1207, 1209 (Fed. Cir. 2005). The Federal Circuit has "an
independent responsibility to decide the legal issue of the
proper meaning and scope of HTSUS terms." *Id.*

Classification of imports under HTSUS involves two
steps. *Orlando Food Corp. v. United States,* 140 F.3d
1437, 1439 (Fed. Cir. 1998); *see also Cummins Inc. v.
United States,* 454 F.3d 1361, 1363 (Fed. Cir. 2006).
First, the trial court must construe the meaning of terms
in a given tariff provision. *Orlando Food,* 140 F.3d at
1439. This step is a question of law, which we review *de*

*novo. MetChem, Inc. v. United States*, 513 F.3d 1342, 1345 (Fed. Cir. 2008). Second, the trial court must determine if the merchandise at issue falls within the tariff provision that the court just construed. *Orlando Food*, 140 F.3d 1439. This step is a question of fact, which we review for clear error. *Home Depot U.S.A., Inc. v. United States*, 491 F.3d 1334, 1335 (Fed. Cir. 2007).

## II

Deckers's arguments can be grouped into two categories: (1) the Court of International Trade erred in not analyzing new evidence Deckers presented to demonstrate clear error in the *Deckers I* opinion so that Deckers could argue that *stare decisis* would not apply; and (2) the Court of International Trade erred in holding that *stare decisis* limited its classification decision because this appeal presents an issue of law that was not before the panel in *Deckers I*.

Deckers first claims that there can be no *res judicata* from *Deckers I* under *United States v. Stone & Downer Co.*, 274 U.S. 225 (1927). In *Stone & Downer*, the Supreme Court held that *res judicata* principles did not apply to Customs classification cases, in what was then the Court of Customs Appeals, unless a later case involves the exact same importation event as the prior decision. *Id.* at 236-37.

Deckers then argues that the *Deckers I* holding—that "training shoes" must have enclosed uppers—is clearly erroneous, and *Deckers I* would therefore not be binding on the Court of International Trade or this panel pursuant to *Schott Optical Glass, Inc. v. United States*, 750 F.2d 62 (Fed. Cir. 1984). According to Deckers, *Schott Optical* permits any court—including any subsequent panel of this court—to review a prior interpretation of a classification provision by this court and to disregard that interpretation upon a showing of clear error. Deckers states that the *Deckers I* decision was clearly erroneous because any

shoe that is "designed, marketed, sold and used as a training shoe" should be classified *eo nomine* as a training shoe in subheading 6404.11, whether it has an enclosed upper or not. Appellant Br. 33. Deckers argues that the Sport Sandals are merely an evolutionary step in improving traditional training shoes by providing greater breathability, and that tariff terms are written to embrace future improvements to merchandise that maintain the same function as their predecessors.

Deckers also claims that *stare decisis* is not relevant to this appeal. In addition to analyzing Additional Note 2, *Deckers I* interpreted the "and the like" language of subheading 6404.11 through an *ejusdem generis* analysis. For the present appeal, Deckers states that it has introduced new evidence demonstrating that the Sports Sandals meet the *eo nomine* category of "training shoes" under subheading 6404.11. Deckers thus argues that the *eo nomine* analysis of "training shoes" is a completely independent legal issue from the *ejusdem generis* analysis of "and the like" in *Deckers I*, even though both analyses involve interpretation of the same HTSUS subheading.

The government argues that the holding of *Stone & Downer*—that *res judicata* does not bar classification challenges to later entries of the same type of merchandise by the same party—is irrelevant. It argues that basic principles of *stare decisis* and concepts of what constitutes binding precedent prevent either the Court of International Trade or this panel from reconsidering the legal principle set forth in *Deckers I*. The government argues that, because a prior *ejusdem generis* analysis of a subheading can inform a later court's construction of a named exemplar under an *eo nomine* analysis, no new legal issue is raised here. The government concludes that, because both *Deckers I* and this appeal involve the construction of subheading 6404.11, and because *Deckers I* involved analysis of the term "training shoes," this appeal does not present a new legal issue and *stare decisis* may apply.

The government claims, moreover, that, even if our prior decision in *Schott Optical* allows a trial court to find clear error in a precedential decision by a higher court in classification cases, Deckers has not demonstrated clear error in *Deckers I*.

We agree with the government that *Deckers I* both decided the issue that governs this appeal and is binding on this panel.

## III

Our analysis focuses on two questions, both of which are related to whether *Deckers I* is binding on this panel:

(1) Does the *eo nomine* analysis of the "training shoes" exemplar in subheading 6404.11 pose a new legal question not present in *Deckers I*?

(2) If the *Deckers I* panel did analyze the same legal issue that is presently on appeal, do *Stone & Downer* and our previous opinions require either the Court of International Trade or this panel to hear evidence of claimed clear error in a prior precedential opinion in classification cases?

*Stare decisis* "protects the legitimate expectations of those who live under the law" and prevents "an arbitrary discretion in the courts." *Hubbard v. United States*, 514 U.S. 695, 716 (1995) (Scalia, J., concurring in part) (quoting Alexander Hamilton, THE FEDERALIST No. 78 (C. Rossiter ed. 1961)). The Supreme Court has held that *stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). We have recognized that *stare decisis* exists to "enhance[] predictability and efficiency in dispute resolution and legal proceedings" through creation of settled expectations in prior decisions of the court. *Lighting Ballast Control LLC v. Philips*

*Elecs. N. Am. Corp.*, 744 F.3d 1272, 1281 (Fed. Cir. 2014) (en banc). The courts thus abide by the theory of *stare decisis* to promote these twin pillars of jurisprudence: predictability and stability. *Id.* at 1282.

*Stare decisis* "deals only with law" and each prior precedential holding of the court becomes a "statement of the law, or precedent, binding in future cases before the same court or another court owing obedience to its decision." *Mendenhall v. Cedar Rapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993) (internal citations removed). *Stare decisis*, therefore, is limited to only the legal determinations made in a prior precedential opinion and does not apply to either issues of fact, such as classification of specific goods within a construed tariff provision, or issues of law that were not part of a holding in a prior decision. *Avenues in Leather v. United States*, 423 F.3d 1326, 1331 (Fed. Cir. 2005) ("*Avenues III*").

### SCOPE OF STARE DECISIS UNDER *DECKERS I*

Deckers claims that the legal issues in the present appeal are not the same legal issues determined by the *Deckers I* panel, thereby precluding any reliance on *stare decisis* principles. In particular, Deckers argues that an *ejusdem generis* analysis of a tariff classification subheading is a different legal issue than an *eo nomine* analysis of a listed exemplar within that same subheading. We disagree.

### 1

To prevail on this theory, Deckers would have to prove that an *ejusdem generis* analysis, which identifies the essential characteristics shared by all products under a given subheading, including the listed exemplars under that subheading, would not inform the common meaning of a listed exemplar in an *eo nomine* analysis. Deckers cannot do so. In construing a tariff term, the court first must determine if Congress "clearly defined the term in

either the HTSUS or its legislative history." *Russell Stadelman & Co. v United States,* 242 F.3d 1044, 1048 (Fed. Cir. 2001). If, as here, the term is not clearly defined by Congress, the term's "correct meaning is its common . . . meaning in absence of evidence to the contrary." *Id.*

*Ejusdem generis* analysis "requires that the imported merchandise possess the essential characteristics or purposes that unite the articles enumerated *eo nomine* in order to be classified under the general terms." *Sports Graphics, Inc. v. United States,* 24 F.3d 1390, 1392 (Fed. Cir. 1994). While *ejusdem generis* may not be necessary in the interpretation of a tariff provision if legislative intent is clear, *Sandoz Chem. Works, Inc. v. United States,* 50 C.C.P.A. 31, 35 (1963), *ejusdem generis* is a tool we can use to appropriately construe a statutory provision, *Meco Elec. Prods. v. United States,* 14 Ct. Int'l Trade 181, 190 (1990). In determining the shared characteristics of a list of named exemplars, an *ejusdem generis* analysis attempts to divine congressional intent, which is the purpose behind construing HTSUS provisions. *See, e.g., D.N.&E. Walter & Co. v. United States,* 43 C.C.P.A. 100, 102 (1956) (performing an *ejusdem generis* analysis on a list of rug style exemplars to determine a congressional intent to limit that provision to only woven articles).

An *eo nomine* analysis, on the other hand, attempts to determine the common meaning of a specific listed exemplar in a HTSUS subheading. *Nidec Corp. v. United States,* 68 F.3d 1333, 1336 (Fed. Cir. 1995); *United States v. M&D Miller, Inc.,* 41 C.C.P.A. 226, 229 (1954) ("An *eo nomine* provision in the tariff law . . . is what the commonly accepted meaning of the term happens to be, and where such common meaning is easily and clearly determined through judicial decisions and reports to Congress on the subject by recognized authorities, such findings presumptively include the commercial as well as the

common meaning."). *Eo nomine* designations include all
forms of an article, including future improvements to that
article. *Nootka Packing Co. v. United States*, 22 C.C.P.A.
464, 470 (1935). *Eo nomine* terms are thus forward-
looking, such that they include technological advance-
ments, as long as the improved article performs the same
essential function as the named exemplar. *See, e.g.*,
*Household Mfg. Co. v. United States*, 62 Cust. Ct. 198
(1969); *Kaysons Imp. Corp. v. United States*, 56 Cust. Ct.
146 (1966). An *eo nomine* designation, however, can be
limited by "a shown contrary legislative intent, judicial
decision, or administrative practice to the contrary."
*Nootka Packing Co.*, 22 C.C.P.A. at 470. The Customs
Court, which was the predecessor to the Court of Interna-
tional Trade,[6] has held that, if a named exemplar is
limited by other language in the tariff provision or legisla-
tive history, the *eo nomine* analysis will only include
articles that "possess the essential characteristics of the
specifically named or enumerated article." *M.H. Garvey
Co. v. United States*, 65 Cust. Ct. 434, 444-45 (1970); *id.* at
444 (stating "[t]he indispensable prerequisite, however, is
that the controverted merchandise possess the essential
characteristics of the named article"); *see also Airflow
Tech., Inc. v. United States*, 524 F.3d 1287, 1292 (Fed. Cir.
2008) (using *ejusdem generis* to determine the essential
characteristics of a phrase that itself limited an *eo nomine*
term).

We thus use both *eo nomine* and *ejusdem generis*
analyses to determine the common meaning of a classifi-
cation term and to establish congressional intent with
respect to an HTSUS subheading. In *Airflow Technology*,
we used the interpretation of an "or the like" phrase

---

[6]    The Customs Court became the U.S. Court of In-
ternational Trade in 1980. Customs Courts Act of 1980,
Pub. L. No. 96-417, 94 Stat. 1727.

through both *ejusdem generis* and dictionary definitions, similar to an *eo nomine* analysis, to arrive at the common meaning of an HTSUS subheading term. *Airflow Techs.*, 524 F.3d at 1292. Our opinion in *Outer Circle Products* is also instructive. In *Outer Circle Products*, we sought to determine if "soft-sided, flexible wraps" should be classified under HTSUS subheading 4202.92.90 or 3924.10.50. *Outer Circle Prods. v. United States*, 590 F.3d 1323, 1325 (Fed Cir. 2010). We previously had construed heading 4202 in *SGI, Inc. v. United States*, 122 F.3d 1468 (Fed. Cir. 1997), holding that heading 4202 does "not include containers that organize, store, protect, or carry food or beverages" pursuant to an *ejusdem generis* analysis. The Court of International Trade concluded that *SGI* was not relevant to the dispute before it, because *SGI* involved an *ejusdem generis* analysis of heading 4202, while the then-current case involved an *eo nomine* analysis under that same heading. *Id.* at 1326. We disagreed, finding *SGI* not only relevant to the *eo nomine* analysis, but "controlling in this case," because the *SGI* panel expressly found that none of the listed exemplars "involve[d] containment of any food or beverage." *Id.*

Thus, while an *ejusdem generis* analysis may not be necessary if the common meaning of an *eo nomine* term is apparent, where an *ejusdem generis* analysis has occurred and we have concluded that Congressional intent can be gleaned therefrom, we may not later ignore that conclusion. As we said in *Airflow Technology* and *Outer Circle Products*, an *ejusdem generis* analysis informs the scope and common meaning of each of the listed exemplars in an HTSUS subheading, which is the same goal of an *eo nomine* inquiry. For these reasons, Deckers is incorrect that the *Deckers I* court did not examine the legal issues in the present appeal—both *Deckers I* and the present appeal involve the construction of subheading 6404.11.

2

Our conclusion that no new legal issue is raised in this appeal is consistent with our resolutions in what the parties refer to as the *Avenues in Leather* cases. In *Avenues in Leather, Inc. v. United States*, 178 F.3d 1241 (Fed. Cir. 1999) ("*Avenues I*"), we affirmed a Court of International Trade determination that "leather 'folios' . . . used to store, organize, and carry papers, books, pens, pencils, and the like" should be classified under HTSUS subheading 4202.11.00 rather than subheading 4820.10.20. *Id.* at 1242, 1244-45. We found, under an *ejusdem generis* analysis, that the unifying purpose of goods under heading 4202 was "organizing, storing, protecting, and carrying various items." *Id.* at 1244-45. In *Avenues in Leather, Inc. v. United States*, 317 F.3d 1399 (Fed. Cir. 2003) ("*Avenues II*"), the issue on appeal involved the classification of Calcu-Folios—binders with zippered sides containing a calculator and three ring binder—and, specifically, whether they should be classified under subheading 4202.12.20 or 4820.30.00. *Id.* at 1401-02. The Court of International Trade found the Calcu-Folios to be "substantially similar" to the folios of *Avenues I*, and held that it was bound by *Avenues I* through *stare decisis*. *Id.* at 1402.

On appeal, we held that the Court of International Trade had confounded concepts of claim and issue preclusion—which do not apply in classification cases under *Stone & Downer*—and *stare decisis*. *Id.* By concluding that no new issue of law was raised in *Avenues II* solely because the products were "substantially similar" to the products at issue in *Avenues I*, the Court of International Trade actually applied collateral estoppel—or, more accurately, issue preclusion—principles, rather than honoring *stare decisis*. *Id.* at 1404. The *Avenues II* panel explained that the legal issue on appeal in *Avenues II* involved the construction of subheading 4820.30.00. *Id.* at 1403-04. In *Avenues I*, the panel construed heading

4202. Therefore, *Avenues I* did not involve any determinations of law regarding subheading 4820.30.00 that could be binding on the panel in *Avenues II*. *Id.* In addition, we noted that the merchandise at issue in *Avenues II* was different from the merchandise in *Avenues I*. *Id.* On remand, the Court of International Trade held that the Calcu-Folios should be classified under subheading 4820.10.2020 because the folios did not share the essential characteristics of Heading 4202, the heading at issue in *Avenues I*. *Avenues III*, 423 F.3d at 1329-30. On appeal, we affirmed and held that *Avenues I* is only binding with respect to its legal determination of the "common characteristics" identified for heading 4202. *Id.* at 1331. *Avenues I* did not bind the Court of International Trade regarding how the specific Calcu-Folios should be classified, which is an issue of fact. *Id.* In the *Avenues in Leather* series of cases, we explained that: (1) a prior legal interpretation regarding construction of a specific HTSUS provision can be binding on the Court of International Trade or later panels; but that (2) interpretation of a *different subheading* creates a *different legal issue*, precluding application of *stare decisis*.

Here, Deckers seeks an interpretation of the "training shoes" exemplar under subheading 6404.11. This is the same subheading interpreted in *Deckers I*. Though we used an *ejusdem generis* analysis in *Deckers I*, we held that "[t]he evidence adduced at trial established that the fundamental feature *that the exemplars share* is the design, specifically the enclosed upper . . . ." *Deckers I*, 532 F.3d at 1317 (emphasis added). In our *ejusdem generis* analysis, we looked to each of the listed exemplars in determining the shared characteristic in subheading 6404.11. We stated, moreover, that, for the reasons expressed in the *ejusdem generis* analysis, the sandals at issue were "not the kind of shoes to which subheading 6404.11.80 refers." *Id.* at 1318. Therefore, because *Deckers I* and the present appeal involve the same legal

issue—construction of subheading 6404.11—any legal conclusion regarding the scope of that heading in *Deckers I* presumptively applies.

CLEAR ERROR EXCEPTION TO STARE DECISIS

*Deckers I* provides a binding construction of subheading 6404.11 such that any merchandise classified into that subheading must include "enclosed uppers." *Deckers I*, 532 F.3d at 1316-17. Since it is uncontroverted that the Sports Sandals do not have enclosed uppers, the Court of International Trade correctly held that the Sports Sandals cannot be classified into subheading 6404.11 and, thus, should be classified into subheading 6404.19.35. Deckers claims, however, that, even if the conclusions in *Deckers I* presumptively control, both the Court of International Trade and this panel may revisit *Deckers I* and reject it if we find it to have been clearly erroneous— which Deckers says it was. Deckers points to our opinion in *Schott Optical,* asserting that we there recognized a "clear error" exception to *stare decisis.* In particular, Deckers argues that the Court of International Trade erred by not considering new evidence presented by Deckers showing that the *Deckers I* panel committed clear error in its construction of subheading 6404.11, as it was required to do under *Schott Optical.* We disagree. Deckers reads too much into *Schott Optical.*

1

In this Circuit, a later panel is bound by the determinations of a prior panel, unless relieved of that obligation by an en banc order of the court or a decision of the Supreme Court. We thus must determine what *Schott Optical* held and whether it governs our resolution of this appeal. We begin by considering the legal landscape leading up to the decision in *Schott Optical.*

Prior to 1890, the federal district courts located at local ports of entry handled all litigation regarding duties

on imports. Giles S. Rich, *A Brief History of the United States Court of Customs and Patent Appeals* 6 (1980). The district courts, however, were not consistent in their construction of tariff provisions. In response, Congress created the nine-member Board of General Appraisers in 1890, which would eventually become the United States Customs Court and, later, the Court of International Trade. McKinley Tariff Administrative Act of 1890, § 12, 26 Stat. 131, 136. Decisions of the Board of General Appraisers could be appealed to the Circuit Courts of Appeals—once they were created in 1891—and, thereafter, to the United States Supreme Court. Rich, *supra*, at 6-7. In 1909, however, Congress removed tariff interpretations from the purview of the federal courts, including the Supreme Court, by creating the United States Court of Customs Appeals.[7] Act of August 5, 1909, § 29, 36 Stat. 11, 105. The decisions of the Court of Customs Appeals, which always sat en banc, were not reviewable by any Article III courts, neither the Circuit Courts of Appeals, nor the Supreme Court. *Id.* The Court of Customs Appeals was thus the court of last resort for classification determinations.

Between 1909 and 1914, the Court of Customs Appeals recognized the importance of principles of *stare decisis*, stating that, "where a question has been well considered and deliberately determined in one court, another court of coordinate jurisdiction at least is not at liberty to disturb or unsettle the law of the first case, unless impelled thereto by the most cogent reasons." *United States v. Schwartz & Co.*, 3 U.S. Cust. App. 24, 51

---

[7]    The Court of Customs Appeals was not considered to be an Article III court, *Ex parte Bakelite Corp.*, 279 U.S. 438, 460 (1929), until Congress declared the Court to be an Article III court in 1958. Act of August 25, 1958, § 1, 72 Stat. 848, 848.

(Ct. Cust. App. 1912); *see also Perry, Ryer & Co. v. United States*, 2 U.S. Cust. App. 374, 380 (Ct. Cust. App. 1911). Thus, it was Court of Customs Appeals' practice to follow its own prior precedents, where applicable. Because the Court of Customs Appeals was a court of last resort, however, it understood that it could not be inflexibly bound by its prior holdings and had to allow for some ability to overturn prior erroneous holdings. *United States v. Bauer*, 3 U.S. Cust. App. 343, 344 (Ct. Cust. App. 1912) ("Under the doctrine of *stare decisis* we should proceed with caution in disturbing conclusions which were deliberately reached upon full argument. This rule does not preclude our examination of new questions, nor should we go to the length of reaffirming an erroneous position when firmly convinced that we are in error."); *see also United States v. Lun Chong & Co.*, 3 U.S. Cust. App. 468, 469 (Ct. Cust. App. 1912) (holding that it is inappropriate to apply "*stare decisis*" or allow the record of a former case to be used in a pending case, as permitted under then-existing court rules, where the government failed to demonstrate factual similarity between the prior decision and pending appeal).

In 1914, Congress granted the Supreme Court limited appellate review of the decisions of the Court of Customs Appeals where construction of the Constitution or any treaties were drawn into question, or where the Attorney General decided that the case was of such importance as to require Supreme Court review. Act of August 22, 38 Stat. 703, 703 (1914). Even with limited Supreme Court review available, the Court of Customs Appeals continued to apply *stare decisis* to its prior holdings, except where convinced it had committed clear error in a prior decision. *See, e.g., United States v. Mills & Gibbs*, 8 U.S. Cust. App. 422, 428 (Ct. Cust. App. 1918) ("The doctrine of stare decisis is invoked by the importers, and our decision might well have been rested thereon, but partly because of the unquestioned sincere belief of the [petitioner] that

we have committed error and also because if so we desire to correct it, we have carefully considered the whole subject matter.").

In 1926, Congress replaced the Board of General Appraisers with the U.S. Customs Court, which retained the jurisdiction and powers of the Board. Act of May 28, 1926, ch. 411, 44 Stat. 669. As with appeals from the Board, appeals from the Customs Court went to the Court of Customs Appeals.

2

In 1927, the Supreme Court in *Stone & Downer* attempted to clarify the review process for classification determinations. The Supreme Court upheld the Court of Customs Appeals' practice that the "general principle of *res judicata* should have only limited application to [Court of Customs Appeals] judgments."[8] *Stone & Downer*, 274 U.S. at 236. The Court justified its holding on two inde-

---

[8] The Supreme Court, in *Stone & Downer*, used the phrase "*res judicata*" in discussing preclusion in the Customs classification context. Based on the examples the Court provided, however, it appears that, in modern parlance, the Court was referring to issue preclusion. *Id.* at 236-37. We have referred to *Stone & Downer* as variously limiting either *res judicata*, *Schott Optical*, 750 F.2d at 64 ("Under *Stone & Downer*, the doctrine of *res judicata* . . . would not bar Schott from relitigating either the meaning of 'optical glass' or the classification of its filters . . . ."), or collateral estoppel, *Avenues III*, 423 F.3d at 1330 ("It is well settled that collateral estoppel does not prevent an importer from successive litigation over the classification of merchandise, even when the subsequent importations involve the 'same issue of fact and the same question of law.'" (quoting *Stone & Downer*, 274 U.S. at 234)).

pendent grounds. First, it noted that the Court of Customs Appeals had not been subject to any appellate review for its first five years, and was only subject to limited appellate review after that point. *Id.* at 233-35. And, it pointed out that the Board of General Appraisers had adopted the practice of allowing the record and testimony of prior classification determinations to be entered in later, related decisions under Rule 22 of its Rules of Procedure and Practice. *Id.* at 234-35. The Court held that, "objection to the[se] practice[s] has never been made before," which represents "strong evidence not only of the wisdom of the practice but of general acquiescence in its validity." *Id.* at 237. Second, the Court grounded its decision on policy considerations. If an earlier importer receives a favorable classification construction, but a later importer receives a less-favorable construction for essentially the same merchandise, the government should be able to challenge that earlier construction and the early importer should not receive a competitive advantage due solely to the timing of the importation. *Id.* at 236. These, the Court stated, "were doubtless the reasons which actuated the Court of Customs Appeals when the question was first presented to it to hold that the general principle of res judicata should have only limited application to its judgments." *Id.*

The *Stone & Downer* opinion did not discuss *stare decisis*, however, or even address the binding role of prior legal determinations on later Court of Customs Appeals decisions. It also did not upset the general approach of the Court of Customs Appeals to *stare decisis* in classification cases—while an importer may relitigate factual issues unique to a new importation, it is still bound by prior legal constructions of the Court of Customs Appeals, unless the Court of Customs Appeals found its own prior construction to be clearly erroneous.

3

On March 2, 1929, Congress renamed the Court of Customs Appeals the United States Court of Customs and Patent Appeals ("CCPA") and transferred jurisdiction over appeals from the Patent Office from the Court of Appeals for the District of Columbia to the new CCPA. Act of March 2, 1929, §§ 1, 2, 45 Stat. 1475, 1475-76. Importantly, the five-judge CCPA, like its predecessor, always sat en banc as a five-judge panel. *Celestaire, Inc. v. United States*, 120 F.3d 1232, 1235 (Fed. Cir. 1997) ("[T]he Court of Customs and Patent Appeals always sat in [sic] banc and therefore later decisions overcome earlier inconsistent ones.").

The CCPA largely continued the Court of Customs Appeals' approach to *stare decisis*. The CCPA held that the construction of a tariff provision by the CCPA creates binding precedent under *stare decisis. United States v. F.M. Jabara & Bros.*, 19 C.C.P.A. 76, 78 (1931); *United States v. Decorative Novelty Co.*, 17 C.C.P.A. 211, 212 (1929). The CCPA also continued the Court of Customs Appeals' practice of reviewing a prior CCPA tariff interpretation for clear error, as the CCPA was also the court of last resort aside from permissive Supreme Court review through certiorari. *United States v. Consol. Kan. City Smelting & Ref. Co.*, 18 C.C.P.A. 346, 348 (1931). Importantly, the CCPA held that the clear error exception to *stare decisis* only allowed a court to reject a prior decision of a *coordinate court* regarding an issue of law if the court believed there was clear error in that prior decision. *Raphael v. United States*, 23 C.C.P.A. 253, 258 (1936).[9]

---

[9]  For example, the CCPA found that *stare decisis* did not prohibit reconsideration of legal issues where that issue was not fully presented in a prior case and is controlling. *See, e.g., Shell E. Petroleum Products v. United*

While early CCPA decisions outlined the general concept of the clear error exception to *stare decisis*, starting with *Adolphe Hurst & Co, Inc. v. United States*, 33 C.C.P.A. 96 (1946), the CCPA began to clarify its approach to *stare decisis* in classification determinations. In *Adolphe Hurst*, the CCPA held that the trial court "properly relied upon our decision" in a prior case and was bound to the opinions of the appellate court by *stare decisis*, but that the CCPA could review its own prior decisions and overrule those decisions upon a showing of error. *Id.* at 101. The CCPA subsequently explained that judicial decisions "must be understood in . . . context" and should "not . . . be expanded to embrace . . . a factual situation other than, different from, and contrary to, the facts of the case to which the language applies and is used." *United States v. R.J. Saunders & Co.*, 42 C.C.P.A. 128, 136 (1955).

The CCPA's opinion in *United States v. Mercantil Distribuidora, S.A.*, 45 C.C.P.A. 20 (1957) (Rich, J.) ("*Mercantil II*"), contains one of the clearest discussions of the CCPA's approach to *stare decisis* in classification cases. The CCPA initially affirmed, in *Mercantil I*, the Customs Court's classification of prepared beef. *Id.* at 20-21. In a later action, the government attempted to reargue the same issues presented in *Mercantil I*, but also supplemented the record with two exhibits that had not previously been considered. *Id.* The Customs Court held that

---

*States*, 28 C.C.P.A. 155, 157 (1940) (finding that *stare decisis* did not apply because the record in the second appeal presented new evidence such that the issues were "explained with a clarity that presents an entirely different view of the issue"); *Frank P. Dow Co. v. United States*, 21 C.C.P.A. 282, 289-90 (1933) (finding clear error where directly applicable legislative history was not presented in the first appeal).

*Mercantil I* "is *stare decisis* of this litigation." *Id.* at 23.
The CCPA affirmed that decision. *Id.* at 27. In doing so,
the CCPA stated that "[t]he public policy of putting an
end to litigation and of not reopening questions which
have been decided is a sound one, subject only to the
qualification that *clear* error should not be perpetuated."
*Id.* at 23-24 (emphasis in original). The CCPA also de-
scribed the appropriate standard it would apply in revisit-
ing its past classifications—"sound policy dictates that
prior decisions shall stand until the court is *convinced*
they are wrong." *Id.* at 24 (emphasis in original).

After *Mercantil II*, the CCPA's approach to *stare deci-
sis* in classification cases became fairly established and
consistent. The CCPA continued to state that "it is not
the province of a lower court to set aside the ruling of an
appellate court," so the Customs Court would appropriate-
ly dismiss cases that challenged established tariff con-
structions on *stare decisis* grounds. *R.J. Saunders & Co.
v. United States*, 45 C.C.P.A. 87, 89 (1958); *cf. B. Axelrod
& Co. v. United States*, 70 Cust. Ct. 117, 123-24 (1973)
(invoking the clear error doctrine and declining to follow a
prior, unappealed decision of the Customs Court). The
CCPA, sitting (as it always did) as an en banc court when
reviewing decisions of the Customs Court, could review its
prior classification constructions, but would only disre-
gard *stare decisis* after a convincing showing of clear
error. *See, e.g., United Merchs., Inc. v. United States*, 468
F.2d 208, 210 (C.C.P.A. 1972) ("A readjudication of issues
previously determined demands a clear and convincing
showing of error, a requirement not satisfied by reargu-
ment of the former issues on the same record."); *Manca,
Inc. v. United States*, 47 C.C.P.A. 103, 105 (1960) ("On
principles of *stare decisis* [our prior holding] is controlling,
as held below, unless the importer can show that the
decision was clearly erroneous or that the imported mer-
chandise here involved is not the same in kind."); *J.
Eisenberg, Inc. v. United States*, 46 C.C.P.A. 11, 14 (1958);

*United States v. Charles H Demarest, Inc.,* 45 C.C.P.A. 109, 111 (1958).

The CCPA cases Deckers relies upon in arguing that both this panel and the Court of International Trade should entertain a clear error review of *Deckers I,* such as *United States v. Dodge & Olcott, Inc.,* 47 C.C.P.A. 100 (1960), or *H.W. Robinson Air Freight Corp. v. United States,* 48 C.C.P.A. 148 (1961), are themselves consistent with prior CCPA practice. In *Dodge & Olcott,* the CCPA noted that it is "unfair both to the courts and to the parties" to relitigate issues previously determined "except upon a clear and convincing showing of error." *Dodge & Olcott,* 47 C.C.P.A. at 103. This standard is not satisfied by "reargument of the former issues on the same or a merely cumulative record." *Id.* In *H.W. Robinson,* the CCPA first held that the Customs Court correctly determined that a prior CCPA opinion was controlling. *H.W. Robinson,* 48 C.C.P.A. at 150. The CCPA then concluded, however, that its prior opinion was "bereft of its rationale, and contra to strong indicia of Congressional intent as found in the statutory language and the legislative history." *Id.* at 151. Because there was clear evidence that the prior construction of the operative provision was inconsistent with Congressional intent, the *en banc* CCPA invoked the clear error doctrine and declined to apply *stare decisis* to its own prior en banc decision. *Id.* at 151-52. *H.W. Robinson* demonstrated just how substantial a hurdle the party challenging a prior CCPA holding faced—the party had to show that the prior CCPA interpretation was clearly inconsistent with evidence of plain language or Congressional intent.[10]

---

[10] Even in some of the last decisions of the CCPA, prior to formation of the Federal Circuit, the CCPA maintained a limited scope of clear error review. *See United States v. Elbe Prods. Corp.,* 655 F.2d 1107, 1109-10

4

On April 2, 1982, Congress created the Federal Circuit by merging the CCPA and the United States Court of Claims. Federal Courts Improvement Act of 1982, 96 Stat. 25. In our first published opinion, sitting en banc, we adopted the case law of the CCPA as our binding precedent. *South Corp. v United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc). "[T]he Court of Customs and Patent Appeals always sat in [sic] banc" and, therefore, the most recent decision of the CCPA controls as precedent over prior inconsistent decisions. *Celestaire*, 120 F.3d at 1235. We have also adopted the rule that a panel of this court—which normally sits in panels of three, and not en banc—is bound by the precedential decisions of prior panels unless and until overruled by an intervening Supreme Court or en banc decision. *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316 (Fed. Cir. 2013) (en banc); *UMC Elecs. Co. v. United States*, 816 F.2d 647, 652 n.6 (Fed. Cir. 1987); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860, 863 (Fed. Cir. 1985); *Mother's Rest., Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1573 (Fed. Cir. 1983). Thus, we as a panel are bound by prior CCPA decisions unless and until those CCPA decisions are overturned en banc or through Supreme Court intervention, just as we are bound by other panel decisions of this court.

We first substantively analyzed the role of *stare decisis* in classification cases in *Schott Optical Glass, Inc. v. United States*, 750 F.2d 62 (Fed. Cir. 1984). In *Schott*

---

(C.C.P.A. 1981); *Dep't of Energy v. Westland*, 565 F.2d 685, 689-90 (C.C.P.A. 1977) ("The position of this court on the role of *stare decisis* is clear and consistent with that of the other appellate courts. A readjudication of issues previously determined demands a clear and convincing showing of error.").

*Optical*, the importer challenged the classification of filter
glass used in instruments such as spectrophotometers.
*Id.* at 63-64. In a first appeal, the Customs Court and the
CCPA held that the term "optical glass" did not include an
additional requirement involving the refractive index of
the glass.[11] *Schott Optical Glass, Inc. v. United States*,
468 F. Supp. 1318, 1323-25 (Cust. Ct. 1979), *aff'd*, 612
F.2d 1283 (C.C.P.A. 1979). Schott Optical then chal-
lenged the prior CCPA determination before the Court of
International Trade in the context of a subsequent impor-
tation. That court held, however, that it was bound to the
interpretation of "optical glass" previously established by
the CCPA. *Schott Optical Glass, Inc. v. United States*,
587 F. Supp. 69, 70-71 (Ct. Int'l Trade 1984). The Court
of International Trade also excluded all evidence which
Schott Optical introduced relating to the meaning of
"optical glass." *Id.* On appeal, we first recognized that, as
established in *Stone & Downer*, there is no *res judicata*
bar to classification challenges in a later importation of
the same merchandise by the same parties. *Schott Opti-
cal*, 750 F.2d at 64 ("[T]he Supreme Court held that in
customs classification cases a determination of fact or law
with respect to one importation is not *res judicata* as to
another importation of the same merchandise by the same
parties. The opportunity to relitigate applies to questions
of construction of the classifying statute as well as to
questions of fact as to the merchandise."). We recognized,
however, that the holding of *Stone & Downer* did not
address principles of *stare decisis*, citing to *Mercantil II.*
*Id.* We then held that, because the binding effect of a
prior classification can be overcome by a showing of clear
error, the Court of International Trade should have
permitted the challenging party to introduce evidence of

---

[11] As noted above, subsequently, the Customs Court
became the U.S. Court of International Trade. Customs
Courts Act of 1980, Pub. L. No. 96-417, 94 Stat. 1727.

"clear error" in that court so it could urge a contrary result. Specifically, we said that "[a] court will reexamine and overrule a prior decision that was clearly erroneous." *Schott Optical,* 750 F.2d at 64 (citing *H.W. Robinson* and *Adolphe Hurst*).

Importantly, *H.W. Robinson* and *Adolphe Hurst,* the cases upon which *Schott Optical* relied, involved an en banc CCPA overruling a prior en banc CCPA decision. When considered in the historical context of our predecessor court, *Schott Optical* is consistent with our current approach to *stare decisis* for en banc opinions, where the most recent en banc decision on a specific matter overrules prior en banc decisions. *Doe v. United States,* 372 F.3d 1347, 1355 (Fed. Cir. 2004). If taken out of this context, as Deckers suggests, *Schott Optical* would be inconsistent with our approach to *stare decisis among panel decisions,* where we are bound by prior panel decisions until they are overruled by the court en banc or the Supreme Court. *Robert Bosch, LLC,* 719 F.3d at 1316.

*Schott Optical's* reliance on *John C. Rogers & Co. v. United States,* 63 C.C.P.A. 10 (1975), *Dodge & Olcott, Inc., Mercantil II,* and *Adolphe Hurst,* when stating that "[i]n a number of cases . . . parties were permitted to relitigate the common meaning of tariff terms, with or without introduction of new evidence," supports the conclusion that the holding there is narrower than Deckers claims. *Schott Optical,* 750 F.2d at 65. Again, the cited cases all involved an en banc CCPA analyzing new evidence in reviewing a prior en banc CCPA opinion. In *John C. Rogers & Co., Dodge & Olcott,* and *Mercantil II,* the CCPA failed to find clear error in prior CCPA opinions, even though *the en banc CCPA* considered new evidence in the respective subsequent appeals. Finally, *Adolphe Hurst* held that it was proper for the trial court to dismiss a classification case on *stare decisis* grounds without clear error review if a prior appellate court opinion construed the term at issue. *Adolphe Hurst,* 33 C.C.P.A. at 101.

While there is some dictum in *Schott Optical* which implies that conclusions regarding the continuing validity of a prior appellate decision can be made by the trial court, or a subsequent panel of this court, we do not read *Schott Optical* that way. At most, opinions expressed by the Court of International Trade or a subsequent panel regarding an earlier Federal Circuit panel decision would constitute invitations to the en banc court to revisit the legal issue raised.[12] The panel in *Schott Optical* had no authority to go further—it could not have overruled our decision in *Mother's Restaurant*. If it intended to do so, moreover, we would be bound to ignore it. *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in [sic] banc. Where there is a direct conflict, the precedential decision is the first." (internal citations omitted)); *see also Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed. Cir. 1989) ("Where conflicting statements such as these appear in our precedent, the panel is obligated to review the cases and reconcile or explain the statements, if possible. If not reconcilable and if not merely conflicting dicta, the panel is obligated to follow the earlier case law which is the binding precedent.").

We therefore hold that, while a party may challenge a prior construction of a tariff provision by a panel of this court in a classification case and may seek to introduce evidence of purported clear error in the prior classification

---

12  *See Schott Optical*, 750 F.2d at 65 ("We cannot say whether [the new evidence], when added to the evidence in the prior case and subjected to cross-examination when testimonial, would cause either the Court of International Trade or this court on appeal to conclude that the prior decision was clearly erroneous.").

to preserve the issue for potential en banc review, both the Court of International Trade and any subsequent panel of this court are bound by the earlier panel's classification construction. It is only as an en banc court that we can review and alter a tariff classification construction by a prior panel. This approach is consistent with our treatment of *stare decisis* in other areas of law and is consistent with the approach of our predecessor court, the CCPA.

5

After considering our historical approach to *stare decisis* in Customs classification cases, including that of our predecessor courts, we hold that the construction of a Customs classification provision by a panel of this court is binding upon both the Court of International Trade and subsequent panels of this court in later protest cases involving the same subheading or heading. While, in line with *Stone & Downer*, an importer may seek permission to introduce evidence in the Court of International Trade of clear error in a prior Customs ruling, *see Stone & Downer*, 274 U.S. at 236 (noting the Court of Customs Appeals' holding that "the general principle of res judicata should have only limited application to *its* judgments." (emphasis added)), the trial court and this court are constrained by *stare decisis* to reach the same legal conclusions as were reached by a panel of this court. Only through an en banc opinion, intervening Supreme Court precedent, or a change in the underlying statute by Congress can we deviate from our prior construction through a showing of clear error. Of course, our holding does not prevent an importer or the government from arguing, or the Court of International Trade or a later panel of this court from concluding, that a different governing legal issue is involved in the later appeal, such that *stare decisis* is not implicated—as was true in *Avenues II*—or that the imported merchandise is materially different

from the merchandise in the earlier case—as we found in *Avenues II* and *Avenues III*.

We therefore affirm the holding of the Court of International Trade granting the government's motion for summary judgment. In *Deckers I*, we construed subheading 6404.11. We are bound by that panel's interpretation of subheading 6404.11, as the Court of International Trade held below. Because all of the Sports Sandals at issue in the present appeal indisputably do not have "enclosed uppers," the Court of International Trade correctly determined that the Sport Sandals could not be classified under subheading 6404.11.80 or 6404.11.90. If Deckers seeks to overturn the *Deckers I* court's construction of subheading 6404.11, it will need to seek review en banc.

## CONCLUSION

Because Deckers presents the same issue of law that was before this court in *Deckers I*, both the Court of International Trade and this panel are bound by the *Deckers I* construction of subheading 6404.11 under principles of *stare decisis*. Accordingly, we affirm the decision of the Court of International Trade granting the government's motion for summary judgment.

## AFFIRMED

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## *Questions and Answers*

## Petitions for Rehearing (Fed. Cir. R. 40)
## and
## Petitions for Hearing or Rehearing En Banc (Fed. Cir. R. 35)

---

*Q. When is a petition for rehearing appropriate?*

A. Petitions for rehearing are rarely considered meritorious. Consequently, it is easiest to first answer when a petition for rehearing is not appropriate. A petition for rehearing should not be used to reargue issues already briefed and orally argued. If a party failed to persuade the court on an issue in the first instance, they do not get a second chance. This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36, as a disposition of this nature is used only when the appellant has utterly failed to raise any issues in the appeal that require an opinion to be written in support of the court's judgment of affirmance.

Thus, as a usual prerequisite, the court must have filed an opinion in support of its judgment for a petition for rehearing to be appropriate. Counsel seeking rehearing must be able to identify in the court's opinion a material error of fact or law, the correction of which would require a different judgment on appeal.

*Q. When is a petition for hearing or rehearing en banc appropriate?*

A. En banc decisions are extraordinary occurrences. To properly answer the question, one must first understand the responsibility of a three-judge merits panel of the court. The panel is charged with deciding individual appeals according to the law of the circuit as established in the court's precedential opinions. While each merits panel is empowered to enter precedential opinions, the ultimate duty of the court en banc is to set forth the law of the Federal Circuit, which merit panels are obliged to follow.

Thus, as a usual prerequisite, a merits panel of the court must have entered a precedential opinion in support of its judgment for a suggestion for rehearing en banc to be appropriate. In addition, the party seeking rehearing en banc must show that either the merits panel has failed to follow identifiable decisions of the U.S. Supreme Court or

Federal Circuit precedential opinions or that the merits panel has followed circuit precedent, which the party seeks to have overruled by the court en banc.

*Q. How frequently are petitions for rehearing granted by merits panels or petitions for rehearing en banc accepted by the court?*

A. The data regarding petitions for rehearing since 1982 shows that merits panels granted some relief in only three percent of the more than 1900 petitions filed. The relief granted usually involved only minor corrections of factual misstatements, rarely resulting in a change of outcome in the decision.

En banc petitions were accepted less frequently, in only 16 of more than 1100 requests. Historically, the court itself initiated en banc review in more than half (21 of 37) of the very few appeals decided en banc since 1982. This sua sponte, en banc review is a by-product of the court's practice of circulating every precedential panel decision to all the judges of the Federal Circuit before it is published. No count is kept of sua sponte, en banc polls that fail to carry enough judges, but one of the reasons that virtually all of the more than 1100 petitions made by the parties since 1982 have been declined is that the court itself has already implicitly approved the precedential opinions before they are filed by the merits panel.

*Q. Is it necessary to have filed either of these petitions before filing a petition for certiorari in the U.S. Supreme Court?*

A. No. All that is needed is a final judgment of the Court of Appeals. As a matter of interest, very few petitions for certiorari from Federal Circuit decisions are granted. Since 1982, the U.S. Supreme Court has granted certiorari in only 31 appeals heard in the Federal Circuit. Almost 1000 petitions for certiorari have been filed in that period.

July 21, 2008

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 5th day of June, 2014, I caused the attached petition to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Marcella Powell, Esq.
Civil Division, United States Department of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York  10278
(212) 264-9230 or (212) 264-1873

/s/ Patrick D. Gill
Counsel for Plaintiff-Appellant